# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-2151

_____

Susan Thayer, Qui Tam *Plaintiff*/Relator

*Plaintiff - Appellant*

v.

Planned Parenthood of the Heartland, Inc., formerly known as Planned Parenthood of Greater Iowa, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: May 13, 2021
Filed: September 3, 2021

_____

Before COLLOTON, WOLLMAN, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Susan Thayer filed this *qui tam* action against Planned Parenthood of the Heartland asserting causes of action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* She says that Planned Parenthood violated Iowa law by dispensing extra cycles of oral contraceptives without a physician's order and that Planned Parenthood illegally

billed Iowa Medicaid Enterprise (IME) for post-abortion related procedures. The district court[1] granted summary judgment to Planned Parenthood on both counts. We affirm.

## I.

Planned Parenthood of the Heartland is an Iowa non-profit that provides reproductive services to low-income patients through Medicaid, a joint federal-state program to reimburse health providers for services to eligible patients. Thayer was center manager for Planned Parenthood's clinic in Storm Lake, Iowa from 1991 to 2008. She also worked as a clinic manager in LeMars, Iowa for four of those years.

Thayer says that from January 2006 to December 2008, Planned Parenthood submitted false claims to the Government and received reimbursement from IME for services and procedures contrary to Planned Parenthood protocols and both federal and state law. She filed this *qui tam* action in 2011. Neither the United States nor the State of Iowa intervened.

Early on, Planned Parenthood filed a motion to dismiss for failure to plead with particularity under Federal Rule of Civil Procedure 9(b). The district court granted the motion, and Thayer appealed. We reversed on two of the claims because Thayer "pled sufficiently particularized facts to support her allegations that Planned Parenthood violated the FCA." *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 919 (8th Cir. 2014).

After remand and another motion to dismiss Thayer's Third Amended Complaint, two claims remain. First, Thayer says Planned Parenthood dispensed oral

---

[1]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

contraceptives prior to or without a physician's order, knowing it was against Iowa law. Thayer specifically argues that Planned Parenthood violated its own protocols by changing prescriptions for and providing extra cycles of oral contraceptives without a physician's sign-off. Second, Thayer claims that Planned Parenthood billed IME for abortion-related services in violation of both federal and state law. She says that through its coding and billing procedures, Planned Parenthood intentionally separated charges for services related to a previous abortion but submitted additional claims to receive reimbursement anyway.

After discovery, Planned Parenthood moved for summary judgment and Thayer cross-moved on several of Planned Parenthood's affirmative defenses. The district court granted summary judgment to Planned Parenthood. The court first held that Thayer had not sufficiently pleaded her claim that Planned Parenthood changed or dispensed extra cycles of prescriptions. On her second claim, the district court held that Thayer could not show that Planned Parenthood actually billed IME for services related to non-covered abortions because every example she pointed to included codes for additional covered services. Thayer appeals.

II.

"We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to [Thayer] as the nonmoving party and drawing all reasonable inferences in her favor." *Roebuck v. USAble Life*, 992 F.3d 732, 735 (8th Cir. 2021).

The False Claims Act allows private citizens to recover damages on behalf of the United States from anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim . . . ," 31 U.S.C. § 3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). To bring a claim under the FCA, the

relator must show "that (1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *In re Baycol Prods. Litig.*, 732 F.3d 869, 875 (8th Cir. 2013) (citation omitted). The relator must also show that "the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (addressing claim under § 3729(a)(1)(A)); *see also United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 503 (applying same rule to claim brought under § 3729(a)(1)(B)).

### A.  Oral Contraceptive Dispensing

Thayer first argues that Planned Parenthood violated the FCA by submitting claims for payment for oral contraceptives dispensed without a physician's sign-off, contrary to Iowa law. To receive reimbursement from Iowa and the federal government, Planned Parenthood agreed to "comply with all applicable Federal and State laws, rules, and written policies to the Iowa Medicaid program, including . . . the rules of the Iowa Department of Human Services and written Department policies, including but not limited to policies contained in the Iowa Medicaid provider manual." D. Ct. Dkt. 279 at 3.

Under Iowa law, "person[s], other than a pharmacist [or] physician . . . shall not dispense prescription drugs or controlled substances." Iowa Code § 147.107(1). Family planning clinics are exempt from that blanket prohibition, and are allowed to dispense contraceptive pills or devices "upon the order of a physician." Iowa Code § 147.107(7).

In her Third Amended Complaint, Thayer alleged that Planned Parenthood distributed oral contraceptives without initial clinician approval. At summary judgment, Planned Parenthood argued its practice was lawful. Thayer responded that

Planned Parenthood dispensed *extra cycles* for eight patients and *changed brands* of prescriptions for three patients without a physician's approval.[2] While Thayer's Third Amended Complaint survived Planned Parenthood's motion to dismiss, the district court found that Thayer had not specifically pleaded any theory about dispensing extra cycles or changing brands—Thayer's theory at summary judgment—and granted Planned Parenthood summary judgment.

Thayer's claim is a hybrid of implied false certification and fraudulent inducement: When Planned Parenthood submitted claims for reimbursement, it allegedly misrepresented that it complied with all relevant law. That induced the Government to reimburse it for false claims. *See Escobar*, 136 S. Ct. at 2001; *Miller*, 840 F.3d at 500. "Because the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b)." *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). Under the heightened particularity standards of Rule 9(b), "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts." *Id.* The relator must state "when the acts occurred, who engaged in them, and what was obtained as a result." *Id.* "A district court may enter summary judgment dismissing a complaint alleging fraud if the complaint fails to satisfy the requirements of Rule 9(b)." *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995).

---

[2]Planned Parenthood's internal policies allowed staff to dispense one extra cycle of oral contraceptives without a physician's approval if the patients had an existing prescription and that prescription would run out before the patient could return to the clinic for an exam. If they did, a clinician had to "write or co-sign the written order for [the] extra cycle as soon as possible." Planned Parenthood Br. 35 (citation omitted). Planned Parenthood staff could also dispense new brands of oral contraceptives without a physician's approval if the patient was experiencing negative side effects.

Thayer's Third Amended Complaint was not particular enough, so the district court was right to grant summary judgment. Thayer's pleaded theory of liability was that Planned Parenthood improperly dispensed new, initial prescriptions for oral contraceptives without a physician's approval—not that staff members provided an *additional* cycle or changed brands for an *existing* prescription. *See* Third Am. Compl. 17–31.[3] Nowhere in her Third Amended Complaint did she mention additional cycles or new brands.

We dealt with similar facts in *United States ex rel. Donegan v. Anesthesia Associates of Kansas City*, 833 F.3d 874 (8th Cir. 2016). A regulation required anesthesiologists to be "present during the most demanding procedures, including induction and emergence" from anesthesia. *Id.* at 877. Donegan initially claimed that AAKC violated the FCA by submitting claims for reimbursement even though its anesthesiologists were rarely present when patients emerged from anesthesia. *Id.* But at summary judgment, Donegan argued that the anesthesiologists were not present during *extubation*, and because removing an endotracheal tube is part of emergence, he had properly pleaded his theory. *Id.* at 880. We dismissed that argument, concluding that extubation—which is not explicitly referenced in the regulations—is different than emergence—which is specifically referenced in the regulations. *Id.* Because the argument about extubation would be different than an argument about emergence, Donegan's alternate theory at summary judgment "deprived the United States of an opportunity to consider [the] theory before declining to join in the action," and so we affirmed the court's grant of summary judgment to AAKC. *Id.*

---

[3]Thayer's complaint alleges that Planned Parenthood "did not provide comprehensive examinations by a doctor or other qualified practitioner . . . provided the client with a three-menstrual-cycle supply of OCPs [oral contraceptive pills] . . . and [t]hereafter, mailed . . . an additional three-menstrual-cycle supply of OCPs approximately every three months . . . . In these cases, OCPs were dispensed . . . without the approval of a primary physician as required by State of Iowa law and regulations." Third Am. Compl. 21 ¶¶ 62–63.

The same is true here. Thayer's first theory was new prescriptions of oral contraceptives without a physician's approval. Her summary judgment argument was different—it focused on existing prescriptions that were extended or changed without a physician's approval. Despite Thayer's suggestion that both theories involve dispensing contraceptives generally without a physician's approval, they are distinct. And asserting new theories after discovery "is inconsistent with the [heightened pleading] obligations under the FCA and with the FCA's protections for the government, the real party in interest in a *qui tam* action." *Joshi*, 441 F.3d at 560. Because Thayer failed to sufficiently plead the claim she presses now, we affirm the district court's grant of summary judgment to Planned Parenthood.

## B. Post-Abortion Related Services

Thayer next argues that Planned Parenthood billed IME for post-abortion related services in violation of Iowa and federal law. She says that Planned Parenthood "knowingly and systematically" fragmented abortion-related services and billed to "financially subsidize abortions." Third Am. Compl. 34 ¶ 103. Thayer points to six patients who received non-covered abortions and returned to Planned Parenthood for more treatment.

### 1. Background

State and federal laws and regulations prohibit Medicaid funds from paying for abortions and abortion-related services, except for specific circumstances. *See* Iowa Admin. Code 441-78.1(249A)(17). According to the Iowa Medicaid Provider Manual, the State will not pay for "[p]hysician and surgical charges for performing the abortion" including related "usual, uncomplicated pre- and post-operative care and visits." Iowa Dep't of Hum. Servs., *Medicaid Provider Manual, Physician Services* E-71 (2001). It also will not pay for "[h]ospital or clinic charges associated with the abortion. . . . [including] routine, uncomplicated pre- and post-operative visits by the

patient." *Id.* Planned Parenthood had to abide by these laws, regulations, and policies to receive reimbursement from IME.

The Manual does not define what "routine, uncomplicated pre- and post-operative visits" are. But, it does list services that are covered "even if performed in connection with an abortion that is not covered":

> *Services that would have been performed on a pregnant woman regardless of whether she was seeking an abortion*, including: [p]regnancy tests[,] [t]ests to identify sexually transmitted diseases [. . .,] [l]aboratory tests routinely performed on a pregnant patient, such as pap smear and urinalysis, hemoglobin, hematocrit, rubella titre, hepatitis B, and blood typing.

> Charges for all services, tests and procedures performed post abortion *for complications* of a non-covered therapeutic abortion, including charges for: [s]ervices following a septic abortion[,] [a] hospital stay beyond the normal length of stay for abortions.

> Note: *family planning*[4] *or sterilization must not be billed on the same claim with an abortion service.* Bill these services separately from the abortion claim.

D. Ct. Dkt. 321 at 8. The regulations also do not clarify what the cut-off date is for a routine post-abortion procedure or service.[5] But under Medicare regulations,

---

[4]The parties agree that family planning includes "providing and discussing birth control" and may be billed to IME.

[5]The parties also agree that Medicare guidelines may serve as a default guideline if Medicaid's regulations are vague, unclear, or incomplete.

"[p]ostoperative visits" means "follow-up visits *during the post-operative period* of the surgery that are *related to* recovery from the surgery." *Id.* at 9 (cleaned up). The post-operative period for the abortions performed on the six patients was ten days. *See* D. Ct. Dkt. 321 at 10. All the patients at issue in this appeal were seen for services that occurred after ten days, so the question is whether the later visits were *related to* the non-covered abortion.

Planned Parenthood requests reimbursement by assigning each service a diagnostic code. Those codes identify the service performed and why the clinician performed it.[6] Then, when Planned Parenthood wants reimbursement, it assigns the service a CPT billing code, which explains the level of service provided and determines the amount for reimbursement.[7]

For non-covered abortions performed between 2006 and 2008—when Thayer was working—Planned Parenthood assigned CPT codes associated with a "global surgical package," which included the surgery, pre-operative care, and uncomplicated post-operative care within certain time periods. So, any post-operative procedure or service within that time period would be labeled under CPT codes associated with the abortion. Iowa law required billing those services separately from any other service. *See supra* Section II.b.1.

---

[6]The four diagnostic codes relevant to Thayer's claim are V67.00 (follow-up examination following unspecified surgery), V25.49 (surveillance of other contraceptive method), V25.41 (surveillance of contraceptive pills), and V74.5 (screening examination for venereal disease).

[7]Planned Parenthood used five different billing codes for patients' office visits, ranging from 99211 through 99215. Medicaid reimburses more for higher-level visits. For example, the more extensive the visit (*i.e.*, more history taken, more questions asked, and more procedures done), the higher the billing code, and ultimately a greater charge and reimbursement amount.

Thayer says that Planned Parenthood sought reimbursement for six patients' post-abortion related services outside of the post-operative time period, disguising them with office-visit billing codes. Thayer claims that their charts reflect a post-abortion status, meaning that the reason for the visit was the prior, non-covered abortion, even though additional services were provided.

Two patients were seen a few weeks after their non-covered abortion: one for an infection and the other for information about a contraceptive device. Planned Parenthood assigned both patients a low office-visit billing code. Of the other four patients, two were seen for bleeding, one for an unrelated infection, and one for a complete exam. All four got contraceptive counseling. For those four patients, Planned Parenthood billed IME one level higher than the other two patients. Thayer claims that Planned Parenthood used covered service codes to disguise abortion-related services and then billed IME for all six patients.

The district court granted summary judgment to Planned Parenthood because Thayer could not show that Planned Parenthood knowingly submitted false claims. In fact, the court found that Thayer could not demonstrate that Planned Parenthood even submitted a false claim. Because the patients also received covered services, there was no way to tell if Planned Parenthood actually billed IME for services that were related to a previous abortion. Thayer appeals, claiming that the district court improperly weighed the evidence.

*2. Analysis*

"The FCA generally 'attaches liability, not to the underlying fraudulent activity, but to the claim for payment.'" *Baycol*, 732 F.3d at 875 (citation omitted). To succeed on her FCA claim, Thayer must first show that Planned Parenthood made false or fraudulent claims or statements to the Government. *Id.* at 875–76. If she can, she must then show that Planned Parenthood knew that the claim or statement was false,

*id.*, and that it was "material to the government's payment decision." *Universal Health Servs*, 136 S. Ct. at 1996; *see also Miller*, 840 F.3d at 503. To answer these questions, we look to the specifics of each of the six patients.

### i. Patients A and B

Patient A (No. -8696) returned to Planned Parenthood 32 days after her non-covered abortion. Her chart reflected she returned for a "post abortion exam" and had complaints that were diagnosed as an infection. She was also counseled on birth control methods. Planned Parenthood assigned three diagnostic codes: V25.49 (surveillance of other contraceptive method), V67.00 (follow-up examination following an unspecified surgery), and 616.1 (bacterial vaginosis). It assigned a billing code of 99212 and received $31.42 in reimbursement from IME.

Patient B (No. -6073) returned to Planned Parenthood 18 days after her non-covered abortion. Her chart noted that she was "post-abortion" but that her visit was related to a different contraceptive device. Planned Parenthood assigned Patient B diagnostic code V25.02 (general counseling on initiation of other contraceptive measures) and billing code 99212. IME reimbursed Planned Parenthood $31.42 for Patient B's visit.

Thayer says that the claims for Patients A and B were false because the primary purpose of the visits was for a post-abortion exam. But this argument fails for two reasons. First, Thayer's expert admitted that a 99212 billing code would be appropriate for counseling on birth control methods, which both patients received. Joint App. Vol. 21 at 5396 ("Q: So if a patient just came in for birth control and they asked the patient about their history of birth control and discussed the patient's birth control option, would that accomplish [that level of a billing code]? A: They would probably end up with a level 2 [99212] office visit, especially if they documented the time that they spent talking with the patient. There wouldn't have to be an exam done on that

situation."). Second, Thayer's expert admitted that regardless of the initial purpose of the visit, Planned Parenthood could bill for the services actually provided. *See* Joint App. Vol. 24 at 6037 ("Q: So but if I am otherwise healthy and the doctor has limited time and he just addresses [one] issue, he should just bill [that] service[], regardless of why the visit was scheduled? A: You bill for the services that are provided."). Because Thayer's own expert admitted that the billing codes assigned to Patients A and B were appropriate for the care they received and that the purpose of the visit is not determinative of the billing code, there is no real dispute that Planned Parenthood did not submit a false claim for these patients.

### ii. Patients C, D, E, and F

Patient C (No. -6852) returned to Planned Parenthood 32 days after her non-covered abortion. She was given a gynecological exam because of continued bleeding. Because it was abnormal to have bleeding that long after surgery, a clinician screened for sexually transmitted infections. The clinician also discussed birth control. Planned Parenthood assigned three diagnostic codes: V67.00 (follow-up examination following unspecified surgery), V25.41 (surveillance of contraceptive pills), and V74.5 (screening for sexually transmitted diseases). Planned Parenthood gave the visit a 99213 billing code and received $43.31 in reimbursement from IME.

Patient D (No. -5191) returned to the clinic 34 days after her non-covered abortion. While her chart notes that the patient was "post-abortion," the clinician discussed the patient's kidney infection (which had been diagnosed elsewhere) and advised her on birth control methods. Planned Parenthood assigned diagnostic codes V67.00 (follow-up examination following unspecified surgery) and V25.49 (surveillance of other contraceptives), and it assigned billing code 99213. IME reimbursed Planned Parenthood $44.00.

Patient E (No. -9957) returned to Planned Parenthood 17 days after her non-covered abortion for "increased bleeding after 24 hours" that was "almost gone." Joint App. Vol 18 at 4704. The clinician evaluated the bleeding, found it was irregular, and told the patient to return to the clinic if it persisted. She was also advised to continue her current birth control method. After the visit, the clinician noted that the patient had a "normal post abortion exam" with irregular bleeding, but that it was considered normal. Planned Parenthood assigned a V25.41 diagnostic code (surveillance of contraceptive pills) for the discussion of birth control and a billing code of 99213.[8] IME reimbursed Planned Parenthood $43.31. Thayer says that Planned Parenthood improperly assigned Patient E's visit the 99213 billing code and received reimbursement for a routine, uncomplicated service related to a non-covered abortion.

Patient F (No. -3232) returned to Planned Parenthood 35 days after her non-covered abortion for a complete exam, also known as an annual visit. The clinician noted that Patient F had a normal gynecological exam. She was counseled on risk of sexually transmitted infections (including screening for STIs), undesired fertility, and birth control, and she had a normal post-abortion exam. Planned Parenthood used the patient diagnostic codes V67.00 (follow-up examination following unspecified surgery), V74.5 (screening for sexually transmitted diseases), and V25.41 (surveillance of contraceptive pills), and assigned billing code 99213.[9] IME reimbursed Planned Parenthood $43.31. Thayer says that Planned Parenthood's claim for Patient F's care was knowingly false because Patient F's records indicate that the patient was seen four

---

[8]Planned Parenthood's expert admitted that it "would have been more accurate" to also include another diagnostic code that reflected the patient's complaint of bleeding, V626.4 (break through bleeding).

[9]Planned Parenthood's expert notes that it actually made a billing mistake and was *under-reimbursed* for Patient F. Instead of the 99213 code, the expert claimed the correct code should have been 99395, which would have resulted in a reimbursement three times higher than 99213.

months earlier for an annual exam, and so the only explanation for Planned Parenthood's billing was to disguise a routine, uncomplicated post-abortion visit.

Thayer claims that Planned Parenthood falsely billed a 99213 code for these patients. She argues each received non-covered, abortion-related care and, absent that care, the 99213 code is unjustifiable. We assume without deciding that she is right, and that Planned Parenthood falsely billed IME for these services. But to prove *knowing* falsity, Thayer must do more than show that the 99213 billing code was wrong; "she must have evidence that the defendants knowingly or recklessly cheated the government." *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 232 (5th Cir. 2008). For a claim or statement "to be knowingly false, a person must have actual knowledge of the information, or act in deliberate ignorance or reckless disregard of the truth or falsity of the information." *Miller*, 840 F.3d at 500 (citation omitted) (cleaned up). "Innocent mistakes and negligence are not offenses under the Act. In short, the claim must be a lie." *Id.* (citation omitted).

Thayer argues that the V67 diagnosis codes, which indicate a post-abortion follow-up, and the timing of Patients E and F's visits, which were made in connection with the initial abortion visit, show the purpose of these visits was abortion-related. From this, she asks us to infer that Planned Parenthood knowingly disguised its billing to cheat the IME.

Again, as Thayer's expert explained, the purpose of the visit is not relevant; the relevant question is what services Planned Parenthood actually billed. *See supra* Section II.B.2.i. Each patient was billed at the 99213 level, but they all received services that justified a 99212 billing code: Patients C and F were screened for STIs, and all were counseled on contraceptives. *See supra* Section II.B.2.i.; *see also* Joint App. Vol. 21 at 5370 ("Q: So you're saying this visit should have been coded as a

-14-

[99212][10] visit?  A:  No, I am saying, if you remove the post-abortion assessment on this patient and did nothing but address the STDs, it would have been a level 2 [99212] and not a level 3 [99213].").  Planned Parenthood notes that the reimbursement difference between 99212 and 99213 was just under $12.  *See* Joint App. Vol. 17 at 4261.  On the facts of this case, we think a one-level difference in billing, resulting in less than a $12.00 reimbursement difference, is at most evidence of an innocent mistake or negligence, not a willful lie to cheat the government.  *See* Miller, 840 F.3d at 500.

"[A]t summary judgment this court examines whether there is a genuine issue of material fact; it does not weigh the evidence or decide credibility."  *Id.* at 502.  If the record reflects "that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue."  *Moore v. Martin*, 854 F.3d 1021, 1025 (8th Cir. 2017) (citation omitted).  We conclude that even if Thayer is right that Planned Parenthood submitted a false claim or statement as to Patients C, D, E and F, she fails to show that there is a genuine issue of material fact over whether those claims and statements were *knowingly* false.

III.

The judgment of the district court is affirmed.

_____

---

[10]During the deposition, the attorney misspoke as to the billing code number. In context, the attorney meant "99212."